FILED
2012 Aug-31  PM 02:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOSH WAYNE MOON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:11-cv-2536-AKK** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Josh Wayne Moon ("Moon") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA").  This court finds that the Administrative Law Judge's ("ALJ") decision as related solely to Listing 12.02(C) - which has become the decision of the Commissioner - is not supported by substantial evidence. Therefore, for the reasons elaborated herein, the court will **REVERSE** and **REMAND** the decision denying benefits for the ALJ to consider the evidence and reach a disability determination based on the total record.

# I. Procedural History

Moon filed his applications for Title II child's disability insurance benefits and Title XVI Supplemental Security Income on May 5, 2009, alleging a disability onset date of August 31, 2007.  (R. 108-112).  Moon alleges that he is unable to work due to Tourette's Syndrome, depression, anxiety, and "leg problems."  (R. 128).  After the SSA denied his applications on August 17, 2009, (R. 79-85), Moon requested a hearing on September 27, 2009, (R. 94).  At the time of the hearing on September 1, 2010, (R. 42), Moon was 24 years old, *see* R. 16, had a high school diploma, (R. 45), and no past relevant work, (R. 25, 70-71).[1]  Moon has not engaged in substantial gainful activity since August 31, 2007.  (R. 16).

The ALJ denied Moon's claims on November 22, 2010, (R. 11-27), which became the final decision of the Commissioner when the Appeals Council refused to grant review, (R. 1).  Moon then filed this action pursuant to section 1631 of the Act, 42 U.S.C. § 1383(c)(3).  Doc. 1.

# II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v.*

_____

[1]Moon's only vocational experience was as a welder for approximately three weeks.  (R. 70-71).

*Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence."  *See id*.  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. § 404.1520(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)     whether the claimant is currently unemployed;

(2)     whether the claimant has a severe impairment;

(3)     whether the impairment meets or equals one listed by the Secretary;

(4)     whether the claimant is unable to perform his or her past work; and

(5)     whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative

answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"  *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do."  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV.  The ALJ's Decision

The ALJ initially determined that Moon had not engaged in substantial gainful activity since his alleged onset date, and therefore met Step One.  (R. 16). Next, the ALJ acknowledged that Moon's severe impairments of Tourette's Syndrome, lumbar radiculopathy, bilateral knee pain, depression, history of attention deficit hyperactivity disorder, and status post fracture of the left mandible met Step Two.  *Id*.  The ALJ then proceeded to the next step, where he found that Moon did not satisfy Step Three since he "does not have an impairment or combination of impairments that meets or medically equals" Listing 12.02(B) and (C).  (R. 20-21).  Although the ALJ answered step three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where he determined that Moon

has the residual functional capacity [RFC] to perform medium work

[ ]. The claimant has no lifting limitations.  However, for safety reasons, he cannot work on ladders, ropes or scaffolds and he cannot work around unprotected heights.  He can occasionally work around hazardous machinery.  He can perform jobs with simple instructions, but not with detailed or complex instructions.  He can concentrate for eight hours during an eight hour workday for two hours at one time.  He should be paid by the hour and he cannot have contact with the public.  He should have no problems with supervision.  He should deal with things and not people and work in an isolated work setting.  Any changes in the work environment should be gradually introduced and well explained.  Changes should occur on an infrequent basis.  He can handle low stress jobs with an SVP of 2 or less involving simple work related decisions.

(R. 21).  The ALJ found that Moon had no past relevant work.  (R. 25).  Therefore, the ALJ proceeded to Step Five where he considered Moon's age, education, experience, and RFC, and determined that there are "jobs that exist in significant numbers in the national economy that [Moon] can perform." (R. 26).  Because the ALJ answered Step Five in the negative, the ALJ determined that Moon is not disabled.  (R. 27); *see also McDaniel*, 800 F.2d at 1030.  It is this finding that Moon challenges.

## V.  Analysis

Moon contends that the ALJ committed reversible error by failing to (1) give controlling weight to Moon's treating physician Dr. Chris LaGanke ("Dr. LaGanke"), (2) present a hypothetical that included all of Moon's non-exertional limitations based on Dr. Eugene Fleece's ("Dr. Fleece") assessment, and (3)

determine that Moon met Listing 12.02(C).  Doc. 9 at 12-34.  For the reasons
stated below, this court finds that the ALJ's finding as related to Listing 12.02(C)
is not supported by substantial evidence and that the ALJ applied improper
standards.

A.      *The ALJ properly considered Moon's treating physician Dr. LaGanke.*

In light of Moon's contention that the ALJ should have accepted Dr.
LaGanke's opinion, the court must review Dr. LaGanke's entire treatment notes.
In that regard, as related to Moon's neurological disorders, the treatment records
reveal that on February 1, 2007, Moon visited Dr. LaGanke for an evaluation of
Tourette's Syndrome.  (R. 251).[2]  Moon's mother reported that Moon has "rage
episodes" and Moon relayed that his Tourette's prevents him from "holding down
a job."  *Id*.  A mental status exam found Moon alert and oriented with normal
attention, and as having intact name repetition and recent and remote recall.  (R.
252).  A motor exam revealed normal strength and tone in all four extremities and
no abnormal movements.  *Id*.  After diagnosing Moon with Tourette's Syndrome
and depression, Dr. LaGanke prescribed Haldol to help control the Tourette's
Syndrome tics and Effexor for the depression.  *Id*.

---

[2]Moon also visited Dr. LaGanke on April 28, 2003, (R. 245), October 3, 2003, (R. 247),
and March 3, 2004, (R. 249).

The Tourette's Syndrome medication proved effective because when Moon visited Dr. LaGanke four months later, on June 22, 2007, Moon reported that he "had one bad spell of a tic since his last visit.  Otherwise he is doing very well.  He is tolerating his medications well." (R. 253).  However, when Moon returned on January 3, 2008, Moon reported that he was out of Haldol, having "increased tics," and "no money or insurance and no one wants to help."  (R. 255).  The examination revealed Moon as alert and oriented and as having intact naming repetition and recent and remote recall.  (R. 256).  Dr. LaGanke prescribed Prozac for Moon's depression, Clonidine to treat anxiety, and a smoking cessation assistance program.  *Id*.

The next visit occurred four months later, on May 20, 2008, when Moon and his father visited Dr. LaGanke. (R. 258).  Moon complained that his Tourette's was worse and although Moon's mental status and motor exams showed no changes, Moon reported "need[ing] a stronger nerve pill" because "class is now over and I can't find a good job. . . I need some Lortab." *Id*.  Moreover, when Dr. LaGanke asked Moon whether Moon took his medications properly, Moon answered vaguely and that "[m]ama always lays them out for me to take." *Id*.  Apparently, Dr. LaGanke touched a nerve when he advised Moon that Moon "needed to prepare his own medications" because Moon left the room and refused

to put up with the "GD disrespectful doctor." (R. 259).  Although Moon and his father returned and apologized to Dr. LaGanke, they left abruptly again after Moon refused to sign a pain contract because Moon felt the contract would prevent him from getting pain medication from another clinic.  *Id.*

Moon's next visit to Dr. LaGanke occurred 18 months later when, on November 19, 2009, Moon presented with complaints of depression, paranoia from "people" purportedly taking pictures of him, and problems with Tourette's. (R. 314).  Moon had no changes to his mental status and motor exams and Dr. LaGanke prescribed Zyprexa, which is used to treat bipolar disorders and schizophrenia, and Paxil for depression and panic disorders.  (R. 315).

Seven months later, on June 29, 2010, Dr. LaGanke again evaluated Moon for depression, a lack of energy, and facial twitching.  (R. 312).  Moon reported that he never filled the Zyprexa prescription, that he is bipolar, and would kill himself if he "thought things were going to stay the same."  *Id.*  Dr. LaGanke noted that Moon was taking Clonidine, Klonopin, Paxil, and Luvox (a medication for obsessive compulsive disorder).  *Id*.  The record is silent on whether Dr. LaGanke prescribed any medication for Moon during this visit.

Finally, on September 17, 2010, at the request of Moon's lawyer, Dr. LaGanke completed a Medical Assessment of Organic Brain Disorder.  (R. 316).

The document consisted of a form for Dr. LaGanke to check off various issues that he believed applied to Moon.  Based on Dr. LaGanke's check marks, Moon's symptoms include pervasive loss of interest, decreased energy, thoughts of suicidal ideations, blunt/flat/inappropriate affect, feelings of guilt and worthlessness, persistent mood disturbance, paranoia, hallucinations or delusions, pathologically inappropriate suspiciousness or hostility, sleep disturbance, emotional withdrawal, bipolar syndrome, and a persistent irrational fear resulting in a compelling desire to avoid dreaded objects.  (R. 316-17).  On the section regarding Moon's mental ability and aptitude for unskilled work, Dr. LaGanke checked that Moon (1) had limited but satisfactory ability to remember work-like procedures, understand and carry out very short and simple instructions, perform at a consistent pace, ask questions or request assistance, and a general awareness of normal hazards, (2) could not meet competitive standards in ability to maintain regular attendance, punctuality, and attention for two hour segments, sustain an ordinary routine without supervision, work in coordination with or proximity to others without unduly being distracted, and make simple work-related decisions, and (3) had no useful ability to complete a normal workday/workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or

peers without unduly distracting them or exhibiting behavioral extremes, respond

appropriately to changes in a routine work setting, and deal with normal work

stress.[3]  (R. 317).  Next, regarding Moon's mental ability and aptitude for semi-

skilled and skilled work, Dr. LaGanke checked that Moon (1) can not meet

competitive standards in his ability to understand, remember, and carry out

detailed instructions, and (2) had no useful ability to set realistic goals or

independently make plans, and deal with the stress of semi-skilled or skilled work.

*Id*.  Dr. LaGanke supported his finding by commenting that Moon has "major

depression with suicidal thoughs" and is "psychotic with paranoia."  *Id*.

Regarding Moon's mental ability and aptitude for "particular types of jobs," Dr.

LaGanke checked that Moon was limited, but with satisfactory adherence to basic

standards of neatness and cleanliness, but without a useful ability to interact with

the general public, maintain socially appropriate behavior, travel to unfamiliar

places, and use public transportation.  *Id*.  Finally, Dr. LaGanke checked also that

Moon had no or mild restriction of activities of daily living, extreme limitation in

maintaining social functioning, marked limitation in maintaining concentration,

persistence or pace, would have "four or more (near constant)" episodes of

---

[3]Dr. LaGanke commented further than Moon suffered from "bipolar disorder which affects energy, concentration, punctuality, and attendance.  In addition, he has psychosis which presently is making him paranoid and confined to home."  (R. 318).

decompensation within a 12 month period, each of at least two weeks in duration, and would miss work more than four days each month because of his impairments. *Id*.

Moon contends that Dr. LaGanke's treatment notes and assessment support his assertion that he is disabled and that the ALJ erred when he rejected Dr. LaGanke's findings.  Doc. 12 at 7-10.  Generally, a treating physician's opinion is entitled to considerable weight if it is supported by and consistent with the record evidence.  20 C.F.R. § 404.1527(d)(2), (3), and (4).  Here, however, as the ALJ stated, the ALJ "considered the attorney generated check form submitted and completed by Dr. LaGanke at the insistence of the claimant's attorney" and found that the

> attorney generated check form is not part of Dr. LaGanke's treatment nor is there any indication throughout Dr. LaGanke's treating records that he ever discussed work limitations or limitations as severe.  Most importantly, in no way do the severity of these check marks by Dr. LaGanke are confirmed by his own treating records.  Dr. LaGanke noted the claimant was still smoking a pack a day of cigarettes and drinking two 2-liter Dr. Peppers daily.  He was driving a car, and driving a car is consistent with the ability to perform sequential postural maneuvers to enter and exit a vehicle, with sitting, with good use of both hands, with operating some hand and foot controls, with good ability to maintain attention and concentration and with the ability to exercise judgment. [ ] Dr. LaGanke informed the claimant he needed to take care of his own medications and not expect his mother to [do] that for him so it would be obvious that Dr. LaGanke believed the claimant had no limitation in this area.  He also needed to talk for himself instead of allowing his dad to do the talking.  Most

> importantly, when Dr. LaGanke spoke frankly with the claimant, the claimant got up and left the room stating he would not put up with a 'disrespectful doctor.' The claimant refused to sign Dr. LaGanke's pain medication contract. [ ] There are simply no mental health notations from Dr. LaGanke supporting his check form assessment and it is given very little weight. It would appear very strongly that the claimant's attitude is his biggest difficulty.

(R. 19). In other words, the ALJ found that Dr. LaGanke's own treatment notes belie the check form assessment he completed and, as a result, gave it "very little weight." *Id.*

Each of the four grounds Moon raises for his contention that the ALJ committed error lacks merit. First, as to Moon's contention that the ALJ discredited Dr. LaGanke's opinion "because it was procured by Mr. Moon's attorney," doc. 9 at 14, while the ALJ in fact described the assessment as "attorney generated," the ALJ rejected it because he found it inconsistent with Dr. LaGanke's treatment notes. Second, as to Moon's contention that the ALJ erred by finding that Dr. LaGanke based his mental health assessment on Moon's subjective statements instead of objective clinical data, doc. 9 at 14-18, indeed, the ALJ found that Dr. LaGanke's assessment was not supported by his treatment records that noted that Moon still smokes, has the "postural maneuvers" to enter and exit a vehicle, good use of hands and feet, ability to operate foot controls, and attention and concentration required to drive a vehicle. (R. 19). The court finds

no error in the ALJ's decision to reject Dr. LaGanke's assessment.  As the ALJ

found, Dr. LaGanke's treatment notes represented that Moon's mental status and

motor exams were within normal ranges, including his concentration, memory, and

muscle strength and tone.  Furthermore, Dr. LaGranke recorded no episodes of

decompensation [4] over the seven year period he treated Moon.  Yet, incredibly, Dr.

LaGanke checked the box in the assessment that such episodes would occur four

or more times each year, and commented further of their "near constant"

occurrence.  There is simply no way to reconcile this finding with the actual

treatment notes, especially in light of the fact that Dr. LaGanke never evaluated

Moon for four or more times each year.  Furthermore, as the ALJ found, Dr.

LaGanke's suggestion to Moon to manage his own medications suggests that Dr.

LaGanke believes Moon can, in fact, sustain a routine and understand and carry

out detailed instructions.  In other words, while this court acknowledges that

Moon has severe impairments, Dr. LaGanke's treatment notes do not support

---

[4]Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.  20 C.F.R. Part 404, Subpart P, Appendix I, 12.00 Mental Disorders, C.4.; *see also* R. 319.

sufficiently the assessment form he completed stating that Moon is unable to sustain the normal routines of a regular work week.

For his third point of error, Moon challenges the ALJ's determination that an inconsistency existed between Dr. LaGanke's opinion that Moon had experienced four or more episodes of decompensation  and Dr. LaGanke's treatment notes.  Doc. 9 at 14, 18.  Moon maintains that Dr. LaGanke's treatment notes actually demonstrate that Moon experienced episodes of decompensation because Dr. LaGanke changed Moon's medications on three occasions (February 1, 2007, January 3, 2008, and November 9, 2009) and because Moon experienced increased tics, paranoia, and depression.  Doc. 9 at 19.  This argument is unpersuasive because, despite changing Moon's medications, Dr. LaGanke opined consistently that he found Moon alert and oriented and with a normal range mental status, including concentration and memory.  Moreover, the record demonstrates that Moon maintained activities of daily living throughout the period Dr. LaGanke treated him, such as taking out the garbage, (R. 59, 65), cooking in the microwave, (R. 48), driving to the store, (R. 47, 60, 69), helping his father feed the chickens, mowing an acre of lawn using a riding lawn mower, (R. 60, *see* R. 55), and hanging up his clothes when reminded, (R. 65).  In other words, the treatment notes do not support Moon's contentions.

Finally, Moon contends also that the ALJ should have contacted Dr. LaGanke for clarification of his opinion.  Doc. 9 at 20.  The court disagrees because Dr. LaGanke's records provide a sufficient "longitudinal picture  of [Moon's] impairment[s]" for the ALJ to properly determine whether Moon's Tourette's Syndrome and depression were disabling.  *See* 20 C.F.R. 404.1527(d)(2)(i).  Furthermore, as discussed above, the ALJ correctly determined that Dr. LaGanke's assessment is internally inconsistent with his treatment notes. Therefore, the court finds that the ALJ committed no reversible error by failing to seek clarification of Dr. LaGanke's opinion, and that the ALJ's decision to reject Dr. LaGanke's opinion is supported by substantial evidence.

B.    *The ALJ's Hypothetical Included Moon's Severe Impairments.*

As an additional ground of error, Moon contends that the ALJ failed to "pose a complete hypothetical question that encompassed all of Mr. Moon's non-exertional limitations."  Doc. 9, 21.  Specifically, Moon contends that the ALJ gave Dr. Fleece's opinion "significant weight," (R. 24), but failed to include in the hypothetical to the VE Dr. Fleece's opinion that "when learning simple, new, repetitive tasks, [Moon] may need greater than average supervision, but after completing routine training, [Moon] could function adequately with only average oversight," and that "[Moon's] tics may occasionally distract co-workers but not to

the point of significant lost production," (R. 301).  In other words, Moon contends

that because the ALJ gave "significant weight" to Dr. Fleece's opinion, the ALJ

was *required* to include every limitation Dr. Fleece prescribed.  Along these lines,

Moon asserts further that the ALJ erred when he failed to include Moon's non-

severe impairments' limitations, such as "stress limitations" in the hypothetical.

Doc. 9 at 25-27.

      The challenged hypothetical reads:

ALJ  I would like for you to assume a hypothetical individual with
the age, education, doesn't appear that he has a work
background.  I'd like for you to assume further that there are no
lifting restrictions, lifting or carrying restrictions.  I'd like for
you to assume safety precautions for such a hypothetical
individual.  Should not work on ladders, ropes, or scaffolds.
Should not work on unprotected heights.  Sounds like he uses a
driving lawn mower sometimes, so I would consider it a
hazardous machinery, so we'll say occasionally can be around
hazardous machinery.  There's no limitation [on] upper
extremities in the ability to [use] gross, handle, or fine
manipulation.  Hypothetical individual can understand,
remember, and carry out short, simple instructions.  No detailed
instructions.  No complex instructions.  Can concentrate for
two-hour periods at a time across an eight-hour work day with
regular breaks.  Should be paid by the hour as opposed to
piecemeal.  And he should not have any contact with the
public.  No problems with supervisors.  Hypothetical individual
should deal with things as opposed to people.  Any work
performed should be essentially on an isolated basis.  Any
changes in the work schedule should be gradually introduce[d],
well explained, and infrequent.  Hypothetical individual can
make short range plans, but would need help on long range
planning.  Hypothetical individual should be limited to a low

stress job which I'll define as SVP: 2 or less.  If we have such a hypothetical individual, could you offer an opinion whether the hypothetical individual could perform any type of job either in the region on the nation?

VE    I would say yes.

(R. 71-72).

Moon's arguments are unpersuasive for several reasons.  First, "[a] claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered it is not dispositive." *Beegle v. Soc. Sec. Admin., Com'r*, No. 11-15565, slip op. at *2 (July 23, 2012); *see also* 20 C.F.R. §§ 404.1545(a) and 404.1527(d)(2).   Therefore, to the extent that the ALJ rejected Dr. Fleece's limitations, the ALJ committed no reversible error. Second, as it relates to Moon's contention that the ALJ failed to include Dr. Fleece's opinion that Moon may need greater supervision when learning simple, new, repetitive tasks, Moon overlooks that even Dr. Fleece opined that Moon *may* require greater training and declined to designate it as an obligatory limitation. Third, the failure to include Dr. Fleece's limitation regarding Moon's tics is immaterial because the ALJ's hypothetical stated that Moon should work on an isolated basis with objects instead of people.  Finally, the evidence simply does not support Moon's contention that he "*assumed* the ALJ found Mr. Moon's impairments other than Tourette's Syndrome to be non-severe" and that the ALJ

Page 18 of  22

failed to consider in his hypothetical Moon's stress.  In fact, the ALJ made clear that Moon's severe impairments included Tourette's Syndrome <u>and</u> lumbar radiculopathy, bilateral knee pain, depression, history of attention deficit hyperactivity disorder, and status post fracture of the left mandible with repair in 2003.  (R. 16).  Furthermore, the ALJ accounted for Moon's stress, the only limitation from the non-severe impairments Moon described, in his hypothetical by limiting Moon to a low stress, unskilled position.  In other words, where, as here, the ALJ's hypothetical question "comprises all of the claimant's impairments," the ALJ committed no error and the VE's testimony "constitute[s] substantial evidence."  *Wilson v. Barnhart*, 284, F.3d 1219, 1227 (11th Cir. 2002) (citation omitted).

C.     *The ALJ improperly determined that Moon failed to meet Listing 12.02(C).*

       Lastly, Moon contends that the ALJ failed to properly evaluate whether Moon has an impairment that meets or medically equals Listing 12.02(C).[5]  Doc. 9

---

       [5]Listing 12.02(C) requires

       Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
       1.  Repeated episodes of decompensation, each of extended duration; or
       2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
       3.  Current history of 1 or more years' inability to function outside a highly

at 27-33.  The full extent of the ALJ's discussion regarding Listing 12.02(C) is

that he "considered whether the 'paragraph C' criteria are satisfied.  In this case,

the evidence fails to establish the presence of the 'paragraph C' criteria."  (R. 21).

Unfortunately, the ALJ's opinion contains no meaningful reference to the medical

record and fails to explain sufficiently the ALJ's reasoning, making review at this

juncture inappropriate.  *Lawton v. Comm'r*, 431 F. App'x 830, 832 (11th Cir.

2011) ("[W]e will reverse where the ALJ fails to apply the correct law or to

provide us with sufficient reasoning to allow us to determine that the proper legal

analysis has been conducted."), citing *Keeton v. Dep't of Health & Human Servs*,

21 F.3d 1064, 1066 (11th Cir. 1994).  As one district judge who faced a similar

situation put it:

> Here, the hearing officer did not justify his findings with any
> evidence at all beyond the lack of hospitalizations. The paragraph C
> criteria have three independent factors, each of which could result in
> a finding of disability for [the claimant].  The hearing officer
> addressed only one of these factors, and did not include any evidence
> or discussion of the other factors.  Even where the hearing officer's
> ultimate conclusion is potentially supportable, the Court ought not
> affirm a decision where there is a reasonable basis for doubting
> whether the appropriate legal standards were applied. [ ].  As a result,
> the Court remands to the administrative agency the issue of whether
> the record evidence supports the Listing 12.02(C) criteria.").

---

supportive living arrangement with an indication of continued need for such an
arrangement.

*Aregano v. Astrue*, No. 10-cv-00159, slip op. at 10 (N.D.N.Y. July 31, 2012).

Based on this court's review of the medical evidence, the court cannot determine whether the ALJ's opinion that Moon does not meet the Listing 12.02(C) criteria is supported by substantial evidence because the ALJ failed to provide adequate reasoning or to substantiate his finding. For example, while the ALJ references "the evidence," (R. 21), he does not identify the medical evidence he relied on to conclude that Moon failed to meet the 12.02(C) criteria. Although the court is not charged with reconsidering the facts, the ALJ's opinion must nonetheless sufficiently reflect full consideration of the facts. Based on this record, this court cannot ascertain whether substantial evidence supports the ALJ's decision as it relates to Listing 12.02(C). Therefore, to maintain the integrity of this court's judicial review, remand is warranted for the ALJ to make a disability determination regarding Listing 12.02(C) that contains sufficient explanations and is substantiated by the objective medical evidence.[6]

## VI. Conclusion

Based on the foregoing, the court concludes that the ALJ's determination that Moon is not disabled is not based on substantial evidence. Therefore, the

---

[6]Dr. Fleece noted that there was "[i]nsufficient evidence to establish the presence of the 'C' criteria," (R. 296), but failed to explain his opinion on this issue in Part IV, as requested, *see* (R. 297). If the ALJ agrees, the ALJ should develop the record so that he can substantiate his findings. 20 C.F.R. § 404.1512(d), (e), and (f).

Commissioner's final decision is **REVERSED** and **REMANDED** for the ALJ to make a disability determination as it relates to whether Moon meets Listing 12.02(C), or any other issue that the ALJ determines warrants review.  A separate order in accordance with the memorandum of decision will be entered.

Done the 31st day of August, 2012.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE